IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 10, 2002 Session

## STATE OF TENNESSEE v. KERRY L. DOWELL

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2000-C-1380     Seth Norman, Judge**

---

**No. M2002-00630-CCA-R3-CD - Filed June 27, 2003**

---

The defendant, Kerry L. Dowell, was convicted by a jury of kidnapping, car jacking, robbery, felony evasion of arrest, and misdemeanor evading arrest, and was sentenced to an effective twenty-four years in the Tennessee Department of Correction. On appeal, the defendant claims that the evidence was insufficient to support his conviction for kidnapping, car jacking, and Class D felony evading arrest; the trial court erred in failing to suppress a statement he made to the police; the trial court erred in failing to give a limiting instruction to the jury regarding the defendant's prior convictions; the trial court failed to properly instruct the jury on lesser-included offenses; and the trial court erred in sentencing the defendant consecutively on one of the counts. The Class D felony evading arrest conviction is reversed. We affirm all other judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part and Reversed in Part**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID G. HAYES and NORMA MCGEE OGLE, JJ., joined.

Ross E. Alderman, District Public Defender, and C. Dawn Deaner and William J. Steed, III, Assistant Public Defenders, for the appellant, Kerry L. Dowell.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Lisa Naylor, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On January 31, 2000, Jacqueline Rogers, the victim, finished a short shopping trip at the Piggly Wiggly grocery store on Old Hickory Boulevard in Nashville, Tennessee, and after leaving the parking lot in her 1999 Kia car, she noticed movement in the back seat. The individual in the back seat then climbed into the front passenger seat, subsequently told the victim to comply with

directions he was giving her, and said, "Don't make me hurt you." The victim was unable to see the individual's face, but identified him as wearing a floppy blue hat. The individual took money, including four fifty-dollar bills, and jewelry from the victim. While at a stoplight, the victim then jumped out of the car, claiming she thought the individual was going to kill her.

The victim gave police a description of her car. Later that evening, a Nashville police officer spotted the car at a convenience store, and then spotted the defendant, wearing a floppy blue hat, leaving the convenience store. The officer initiated an arrest, at which time the defendant got in the Kia and fled the scene, crossing several lanes of traffic. Subsequently, the defendant jumped out of the Kia and was eventually apprehended by a K-9 officer. A search of the defendant revealed a knife in his pocket, two fifty-dollar bills, some additional money, and a blue floppy hat.

The defendant later gave a videotaped confession, in which he said that he got in the victim's unlocked car at the Piggly Wiggly and that, ultimately, the victim jumped out of the car while they were stopped at a red light. Later, the defendant claimed he lied during the confession and that he borrowed the Kia from a person named Darrell, or "Delo," and then drove it to the convenience store. He claimed he "freak[ed] out" when the police confronted him, and so he just ran.

The defendant was indicted on July 31, 2000, on the following charges:
Count 1- Aggravated Kidnapping, in violation of Tennessee Code Annotated section 39-13-304;
Count 2- Kidnapping, in violation of Tennessee Code Annotated section 39-13-304;
Count 3- Carjacking, in violation of Tennessee Code Annotated section 39-13-404;
Count 4- Robbery, in violation of Tennessee Code Annotated section 39-13-401;
Count 5- Felony Evading Arrest (of Officer Davis), in violation of Tennessee Code Annotated section 39-16-603; and
Count 6- Misdemeanor Evading Arrest (of Officer Burke), in violation of Tennessee Code Annotated section 39-16-603.

The defendant's motion to suppress the videotaped confession was denied after a hearing on June 29, 2001.

After a jury trial on July 16-17, 2001, the defendant was found not guilty of aggravated kidnapping, and convicted of the following:
(1) Kidnapping, in violation of Tennessee Code Annotated section 39-13-303, a Class C felony. This conviction was as a lesser-included offense of aggravated kidnapping and a merger of indictment counts one and two;
(2) Carjacking, in violation of Tennessee Code Annotated section 39-13-404, a Class B felony;
(3) Robbery, in violation of Tennessee Code Annotated section 39-13-401, a Class C felony;
(4) Evading Arrest, in violation of Tennessee Code Annotated section 39-16-603, a Class D felony; and

(5) Evading Arrest, in violation of Tennessee Code Annotated section 39-16-603, a
     Class A misdemeanor.

After a sentencing hearing on January 23, 2002, the defendant was sentenced as a Multiple Range II offender to eight years for kidnapping, sixteen years for carjacking, eight years for robbery, four years for the felony evading arrest, and six months for the misdemeanor evading arrest. The sixteen years for carjacking was ordered to be served consecutive to the other sentences, for an effective twenty-four-year sentence. The defendant's motion for a new trial was denied on March 1, 2002, leading to the instant appeal.

## Issues

The defendant raises five issues on appeal:
(1) Whether the evidence was sufficient to support the convictions for kidnapping, carjacking, and felony evading arrest;
(2) Whether the trial court erred in not suppressing the defendant's confession;
(3) Whether the trial court erred in refusing to give a limiting instruction to the jury regarding evidence concerning the defendant's prior convictions;
(4) Whether, as to Count three, the trial court erred in failing to instruct the jury as to the lesser-included offense of robbery and theft, and as to Count five, the lesser-included offense of Class E felony evading arrest; and
(5) Whether the trial court erred in sentencing the defendant to serve Count three consecutive to the other sentences.

## I. Sufficiency

The defendant contends that the following evidence adduced at trial was insufficient to support his convictions for kidnapping, carjacking, and Class D felony evading arrest.[1]

The State presented Jacqueline Rogers, Officer Michael Park, Officer Gregory Davis, Officer James Upchurch, Harold Burke, and Dan Whitehurst. The defendant was the sole witness for the defense.

Jacqueline Rogers, the victim, testified that on January 31, 2000, around 6:30 p.m., she was shopping at the Piggly Wiggly grocery store on Old Hickory Boulevard in Nashville. She said she had not shopped very long before returning to her two-door Kia, where she placed her groceries in the front passenger seat. She testified her Kia had a purple neon license plate frame. Shortly after leaving the grocery parking lot, she said she felt a movement in the back seat of the car, and then someone climbed over her back seat.

---

[1] The defendant does not contest the sufficiency of the evidence supporting his misdemeanor evading arrest conviction. The misdemeanor evasion of Officer Burke was unrelated to the felony evasion of Officer Davis. It is the felony evasion of Officer Davis that the defendant contends was not supported by the evidence.

According to the victim, the individual who climbed over the seat then told her not to panic and that all he wanted was her money. She said she offered him her car, her purse, her credit cards and everything, but he said, "Don't make me hurt you," and told her to keep driving normally. She said he said, "Don't make me hurt you" several times as he instructed her where to drive. She told him she had $200, in four fifty-dollar bills, but he told her she was lying and that he could not find the money. He then asked her for her jewelry, continuing to tell her, "Don't make me hurt you." She said he then took some of her jewelry, then instructed her to drive into an industrial area. She said he had most of her jewelry at this point, so she thought he was leading her to the industrial area in order to rape or kill her. While stopped at a red light, the victim said she saw another car and then jumped out of her car, ran to the other car, and told that driver that she had been robbed and kidnapped. She said she jumped out of the car because she was "scared to death" and believed that might be her last chance to get out (of the car). The victim said she then used the other car driver's phone to call the police. According to the victim, her assailant drove away and "disappeared."

The victim said the only part of the individual in the back seat she could see was a blue floppy hat. She said that when she looked in her rearview mirror, he told her not to do that again, saying, "Don't make me hurt you." The victim recognized a blue hat as the one worn by the man in her car.

The victim testified that at no time did the man in the car tell her she could get out if she wanted to. She said she never saw a weapon. She said that after jumping out of the car, she was sore all over.

The victim testified that "when this had all finished," she looked through her purse to see if any items were missing and everything was there, except the money. She said the defendant ransacked her car and took all the change from it. Additionally, he took some of her jewelry, including necklaces and rings. She said that, in addition to the items that he took, she found additional items of beer, liquor, a green army jacket, and a book of naked women in her car.

On cross-examination, the victim testified that she was not in the Piggly Wiggly very long and that it was around dusk. She said there was one person behind her in her car, but she did not see the person's face. She said the police recovered her car the same day as the incident, but she did not get her car back for a "couple of days." She said she never received any of her property back, including the fifty-dollar bills. On redirect-examination, she testified she was not sure about the exact time she was at the Piggly Wiggly, because it was a Sunday and she "don't really be about clocks on Sundays."

Officer Michael Park, a patrol officer with the Metropolitan Nashville Police Department, testified that on January 31, 2000, he received a dispatch at approximately 8:45 p.m. to respond to Swinging Bridge Road and Industrial Drive and that he arrived there around 9:00 p.m. He said he spoke with the victim, who was very upset and was complaining about hip pain. The victim described the perpetrator to Officer Park as a black male wearing a blue cap. He said the car was found about thirty minutes later, before 9:30 p.m. On cross-examination, Officer Park testified that to the best of his recollection, he received the dispatch at 8:45 p.m. and arrived at the Pilot gas

station where the car was discovered around 9:00 p.m. He said he thought the car was towed away to the metro police impound lot. He said the victim was only able to identify the race and sex of the individual that was in her car. He said the victim's car was found several miles from where he was originally dispatched.

Officer Gregory Davis, with the Metropolitan Nashville Police Department, testified that around 8:00 p.m. on January 31, 2000, he was on patrol when he received a "be on the lookout ("BOLO")" call to watch for a black Kia Sportage with a purple neon license plate frame. He said shortly after the BOLO, he found the car, unoccupied, at a Pilot gas station on Dickerson Road. He said he waited for the driver to come to the car (from the Pilot store), and when he saw the driver come out, Officer Davis "engaged" his blue lights and drove up behind the vehicle (the Kia). He said the driver was wearing jeans, a long sleeve shirt, and a blue "fisherman's" hat. Officer Davis identified the individual as the defendant.

Officer Davis said he then identified himself as a police officer, drew his weapon, and ordered the individual out of the car. He said at this point, the individual shut the car door and drove off through the parking lot in the vehicle. He said the individual then entered Dickerson Road without "stopping, yielding, or anything" and crossed four or five lanes of traffic. He said that there were other vehicles on the road at the time the defendant crossed the four or five lanes of traffic, and that "[G]enerally at that time of day, it's always busy." Officer Davis said that he saw the vehicle slowing down, and he noticed the driver's side door was open. He said the individual jumped out of the car, but reached back into the car with his right arm. According to Officer Davis, the car was put in reverse, causing the car to roll toward Officer Davis' vehicle, while the individual left on foot. He said he chased the individual to the edge of a building and then put out another BOLO, this time for the person. He said the individual was ultimately apprehended, and when he saw him, he no longer was wearing the blue hat. He said the individual had some money in his possession, but Officer Davis was unaware if he had any jewelry at that time.

On cross-examination, Officer Davis said it was less than half an hour from the time the original BOLO went out to the time they spotted the car at the Pilot station. He said after the individual fled the scene on foot, that he (Davis) secured the vehicle until the officer who got the original call came to recover the vehicle. Officer Davis testified that he did not personally recover any items from the vehicle.

Officer James Upchurch, with the Metropolitan Nashville Police K9 division, testified that upon arriving at the scene, he and his dogs tracked the suspect approximately one hundred yards where they found him in a doghouse. He said he noticed a blue hat inside the doghouse and that the suspect had a checkbook in his right rear pocket and a lock-blade knife in his right front pocket. Additionally, Officer Upchurch identified some cash recovered from the scene of the apprehension, including two fifty-dollar bills.

On cross-examination, Officer Upchurch testified that he did not remember seeing any jewelry at the apprehension scene nor did he recall exactly where the recovered money was found.

He said he had no forensic proof that the hat that was recovered actually belonged to the defendant. He said he responded to the (BOLO) call around 9:35 p.m. and was at the apprehension scene around 9:50 p.m. to 10:00 p.m.

Officer Harold Burke, a Metropolitan Nashville Police patrol officer, testified that during the night in question, he spotted someone matching the description of the suspect, identified himself as a police officer, and that the suspect continued running. He said he stopped and called the K-9 unit, which, to the best of his knowledge, apprehended the suspect.

Detective Dan Whitehurst, with the Metropolitan Nashville Police Department's armed robbery unit, testified that he interviewed the defendant on February 3, 2000. He said he had the defendant sign Miranda waivers and that the defendant did not appear to be under the influence and did appear to be quite intelligent. He said they did not use forensic techniques in this case because they are quite expensive and that they had caught the suspect at the scene. During Detective Whitehurst's testimony, a videotape of the defendant's confession was played for the jury. He said the defendant had reservations about the kidnapping charge, so he indicated to the defendant that the charge may not hold up in court. This concluded the State's proof.

The defendant testified on his own behalf. He said that on the night in question, he did not have anything to do with the victim, but he admitted that he was in the Kia. He said he was drinking and carrying on with a group of guys after the Super Bowl, when a guy named Darrell, known as "Delo," showed up driving the Kia. The defendant said he asked Delo if he could use the Kia to drive to the store and get more beer. He said he went to a convenience store and bought a six-pack of Budweiser, but as he walked back to the car, he saw the police cars, then saw the police officers jump out of their cars and tell him to freeze. He said he "freak[ed] out," jumped into the vehicle, drove directly across the road, then jumped out of the vehicle, and took off running. He said maybe ten or fifteen minutes after that, he was apprehended by the police as their police dogs tracked him down. He said he was not in a doghouse but was just outside of it. He said a police dog bit his "legs and stuff," and the police officers would not call the dog off. He said he told the police he did not want to talk to them, but the police told him that if he did not want to talk ,he would get bit by the dog. He said Officer Davis' partner in the police car yelled at him, "[W]hat's your f---ing name," slammed his head against the car hood, and sprayed him with mace. He said there were maybe five or six others in the background saying to "[S]pray his ass again" so he told them "I'll tell you my name; just leave me the hell alone . . ."

The defendant said he was taken to the hospital, where Officer Fleet came to him and took the money from his pockets. He said after a nurse came over and wiped the blood and mace from his face, he was taken downtown and booked. According to the defendant, he got the money that was taken from his pockets from a few bets he made on the football game and from some "under the table" work he did with a roofing company.

The defendant said the videotaped statement he made implicating himself was false. He said he told the police what he told them due to fear, since he already had dog bites and contusions. He

said he also thought the officers would do more investigating than they did. He said had they conducted an investigation, they would have found the right individual, due to DNA evidence and fibers and the like, despite the fact that he said he did it. He said he got the details (about the crime) that he gave in his confession from Delo. According to the defendant, after he gave his confession, he tried to give the prosecutor information about Delo.

On cross-examination, the defendant testified that he knew Delo from the streets, knew that he "stays" in East Nashville, knew Delo's girlfriend by the name of "KK," and did not know Delo's last name. He said he did not give this information about Delo to the detectives because he thought the detectives would "do their jobs" and get prints or hair fibers and that would have led to a name popping up. He contends that during his questioning, he gave "hints" to the police that he thought would lead to them conducting an investigation that would have led to forensic information leading to Delo. He claimed that he lied to the police about his past employment and thought that by lying to them, they would discover the lie and that discovery should have led them to look for somebody else.

The defendant testified that he was pretty intoxicated when Delo told him that he (Delo) had been inside the vehicle and told the driver that he wanted her car and money and that he would not hurt her.[2] According to the defendant, Delo told him that the victim "tripped out on me" and jumped out of the car. He said that Delo told him that he rode around in the car after that, just riding and drinking. He said the whole conversation lasted about five minutes. He said that the blue hat involved in this case was not his and that he had no idea how that hat got next to him at the doghouse where he was apprehended. He said that Officer Davis lied when he said he saw the defendant wearing the blue hat when he came out of the Pilot station.

The defendant was convicted of the following:
(1) Kidnapping, a violation of Tennessee Code Annotated section 39-13-303, a Class C felony. This conviction was a merger of indictment Counts one and two;
(2) Carjacking, a violation of Tennessee Code Annotated section 39-13-404, a Class B felony;
(3) Robbery, a violation of Tennessee Code Annotated section 39-13-401, a Class C felony;
(4) Evading Arrest, a violation of Tennessee Code Annotated section 39-16-603, a Class D felony; and
(5) Evading Arrest, a violation of Tennessee Code Annotated section 39-16-603, a Class A misdemeanor.

He contends the evidence was insufficient to support the convictions for kidnapping, carjacking, and the Class D felony evading arrest.

---

[2] To be clear, the defendant was testifying that Delo was the one in the car, but that the defendant was intoxicated when Delo told him about Delo's activities in the car.

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this court reweigh or re-evaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. Id. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

## A. Kidnapping

Kidnapping is false imprisonment "under circumstances exposing the other person to substantial risk of bodily injury; or where the confinement of another is in a condition of involuntary servitude." Tenn. Code Ann. § 39-13-303(a). False imprisonment is defined as when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a).

Reviewing the evidence in the light most favorable to the prosecution, as we are required to do, we conclude there was ample evidence in which a rational jury could have determined that the victim in this case was falsely imprisoned and exposed to a substantial risk of bodily injury. Evidence at trial adduced that the defendant was in the backseat of the victim's car when the victim returned from the Piggly Wiggly. There is evidence that the defendant said to the victim, "Don't make me hurt you," as he took her money and jewelry and had her drive her car to an industrial area. The defendant ordered the victim to run a red light, exposing her to a substantial risk of harm. Additionally, due to the fear she experienced having the defendant unlawfully in her vehicle, the victim jumped from the vehicle, clearly exposing her to a substantial risk of harm. This court previously determined that in an attempted kidnapping, when the potential victim jumped out of a moving vehicle, that action exposed the victim to a substantial risk of harm. See State v. Hartman, No. E2000-00685-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 36, at *7 (Tenn. Crim. App. Jan. 18, 2001, at Knoxville) perm. to appeal denied (June 4, 2001).

We conclude the evidence supports the determination that the defendant was in the victim's car for the purpose of stealing from the victim and that the words used by the defendant, "Don't make me hurt you," were of such a nature that the victim was justified in being in fear for her life. We disagree with the defendant's contention that the failure of the record to reflect use of a weapon by the defendant necessarily lessens the risk of substantial injury involved in the action. Placing a victim in fear for her life in a moving car plainly exposes that victim to the *risk* of substantial harm, as proven by the victim's injuries absorbed while jumping from the car. In this case, he words the

-8-

defendant used, combined with his actions, lead to the inference that the victim was exposed to the risk of substantial harm.

## B.  Carjacking

Carjacking is the intentional or knowing taking of a motor vehicle from the possession of another by use of:  a deadly weapon or by force or intimidation.  Tenn. Code Ann. § 39-13-404(a). The defendant argues that he did not use a deadly weapon to take the victim's car and that the defendant did not express any interest in taking the car, despite the victim offering it to him, as standing for the proposition that the defendant did not use force or intimidation to take the vehicle. We disagree.

Viewing the evidence in the light most favorable to the prosecution, we conclude a rational jury could have determined that the defendant's repeated statement, "Don't make me hurt you," was intimidating to the victim and made her fear for her life, resulting in her jumping from and abandoning her car.  Additionally, even after the victim jumped out of the car, the defendant kept using it, even stopping at a convenience store to purchase beer.  We conclude the evidence was sufficient to show the defendant knowingly took the victim's car through intimidation or threat and to support the conviction for carjacking.

## C.  Felony Evading Arrest

It is evading arrest for "[A]ny person, while operating a motor vehicle on any street, road, alley or highway in this state, to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from such officer to bring the vehicle to a stop." Tenn. Code Ann. § 39-16-603(b)(1).  While defined as a Class E felony, the offense is a Class D felony if "[T]he flight or attempt to elude creates a risk of death or injury to innocent bystanders or other third parties . . ." Id., § (b)(3).  The defendant concedes the evidence is sufficient to establish a Class E felony, but contends the State failed to prove the additional element of risk of death or injury.  Therefore, we need only review the record to see whether a rational jury could have determined that the defendant's flight created a risk of injury or death to others.

The defendant relies primarily upon State v. Barry Marable, No. M1999-00576-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 704, (Tenn. Crim. App. Sept. 7, 2001, at Nashville).[3]  In Marable, the defendant was convicted of Class D felony evading arrest after testimony that, while fleeing police in his vehicle, he ran several stop signs where cars were parked on both sides of the road and where people were walking. Id., at *12.  This court reversed and modified the conviction to a Class E felony, concluding that the absence of evidence, concerning how the defendant's conduct actually affected the bystanders, left only speculation as to how those innocent bystanders were placed at risk.

---

[3] As author of this opinion, I wish to acknowledge that I was a panel member that joined in the decision in Marable.

Id. This court refused to make that speculation and modified the conviction to a Class E felony and remanded for sentencing. Id., at *12-13.

The defendant argues that the evidence in this case is similarly insufficient to support the creation of risk to third parties. A careful review of the record in this case reveals that Officer Davis located the defendant at approximately 8:30 p.m. at a Pilot station on Dickerson Road. The uniformed officer was within ten to twelve feet of the defendant when the officer drew his weapon and ordered the defendant out of the car. The defendant shut the door to the vehicle and "took off" through the parking lot of the Pilot station. The defendant entered Dickerson Road without "stopping, yielding, or anything." The defendant crossed four or five lanes of traffic and continued through a grassy lot across the street. When asked if there were other vehicles on the road at that time, the Officer Davis testified, "Yes, it was, like I said, it was about 8:30 that night and on Dickerson Road generally at that time of day, it's always busy." A short distance away, the defendant put his vehicle in reverse. It started coming toward the officer's patrol car, and the defendant jumped out, requiring the officer to "resituate" his patrol car before he could give chase. Inside the patrol car was a passenger, taking care of radio transmissions. The defendant testified he was intoxicated while driving and "freak[ed] out" when the police approached.

The distinction between Marable and the facts of the instant case is this jury need not speculate as to "innocent bystanders or other third parties" present. Running a stop sign, as in Marable, would create a risk of death or injury to "innocent bystanders or other third parties" only if they were present at the stop. In Marable, there was no testimony that anyone was present at the stop signs that were run. Therefore, the jury, in order to convict, must have speculated that others were present. This a jury cannot do.

In contrast, the officers in the instant case testified that Dickerson Road was, and is, always busy at the time of day this incident occurred. This jury heard testimony that other vehicles were in the road and that this defendant, who was "intoxicated" and "freak[ed] out," drove onto a five-lane highway without "stopping, yielding, or anything." A rational jury may infer from this testimony that the defendant drove onto a highway where other vehicles (which were occupied by "innocent bystanders or other third parties") were and that he drove in a reckless fashion and in complete disregard for the safety of others on the road.

Here, the above is not the only testimony satisfying the element that the defendant's fleeing created a risk of injury or death to innocent bystanders or other third parties. This defendant put his vehicle in reverse and jumped out of a moving vehicle. Officer Davis had to "resituate" his vehicle to avoid the vehicle that the defendant had abandoned, thereby creating a risk to Officer Davis and his passenger. We conclude there is sufficient evidence to support this conviction.

## II. Motion to Suppress

The defendant contends the trial court erred in not suppressing his confession. Primarily, he argues he invoked his right to silence as well as requested an attorney, and therefore any questioning by the police officers should have stopped. A hearing on the motion to suppress was conducted on June 29, 2001, where the following was adduced:

Detective Daniel Whitehurst, with the robbery unit of the Metropolitan Nashville Police Department, testified that he spoke with the defendant, who was a suspect at the time, on February 3, 2000. He said he explained to the defendant that he was with the armed robbery unit and was working on this case, and asked the defendant if he wanted to speak with him about it. He said the defendant said "no," so he handed the defendant his business card and told him to call him if he changed his mind. He said as he turned to leave, the defendant asked him "[W]hat good would it do me to talk to you about it?" to which he answered, "I can't say it would do any good, you know, but it might make the jury think you're sorry for it or whatever." He said the defendant then said he would talk about it.

According to Detective Whitehurst, he and Detective Arondall[4] took the defendant to the interview room, gave him the Miranda warnings, had him sign a waiver, and then conducted a taped interview of him.[5] He said the defendant did not ask for a lawyer at any time during this process. Detective Whitehurst said the defendant appeared to understand the process and was not under the influence of any drugs when he spoke with him.

On cross-examination, Detective Whitehurst stated that the defendant was in handcuffs when they transported him from booking to the interview. He said the defendant might have mentioned something about being hungry, because Detective Whitehurst remembered that they brought him a "Coke" and some crackers.

The defendant testified that he was at the justice center initially and was going to file a complaint, due to his head being "busted." He said that he met with the detectives and that Detective Whitehurst asked him if he wanted to talk. He said he told Detective Whitehurst he did not want to talk and that he "[A]in't even got an attorney." He said they stopped for a brief second and then Detective Whitehurst sighed and told the defendant that talking with "us" would show the jury and the District Attorney that he was cooperative. The defendant said he was taken to a room and placed behind closed doors. He said he then remembered what happened to him just two or three nights ago

---

[4] Transcripts have this name spelled both Arondall, and Arrendahl.

[5] We had the opportunity to review the videotaped interview. The detectives clearly explained the defendant's Miranda rights and clearly explained to him that he did not have to tell them anything, that talking was voluntary, and that he could stop when he wanted and not answer anything. Subsequently, the defendant said the victim told him that she would take him anywhere and that he was not going to hurt her. He said he looked but did not find any money, although the victim had some jewelry. He said that basically he did take the vehicle and that he did do the crime, because he "felt like it." He said he did not go anywhere after the victim left the car and that he had no destination.

when he did not speak to the police officers (his head being "busted"), so he felt he had no choice but to talk. The defendant said that as Detective Whitehurst was walking him along, the detective told him he had a few questions about his case and that the defendant told him he did not want to talk about the case and did not have an attorney to represent him. The defendant was asked, "Did you specifically say, you wanted to talk to an attorney first?" The defendant responded, "Yeah. I told him I didn't have an attorney yet."

On cross-examination, the defendant said he was familiar with the criminal justice system and indicated that Detective Whitehurst was lying when he said there was no discussion about an attorney. Additionally, he said he was not hungry and that the detectives had offered him something to eat and drink.

The trial court found there was no proof that Detective Whitehurst questioned the defendant at all until after the defendant signed a waiver. Additionally, the trial court found that there was no proof that the defendant did not understand what he was doing nor that he did not understand the waiver. Moreover, the trial court found the signed Miranda waiver to be valid. Referring to the defendant's request for an attorney, the trial court implicitly found that he waived that right when he signed the Miranda waiver. The trial court found there was no proof of any further questioning until the defendant executed a waiver waiving his right to an attorney. Finding that waiver to be clear about the defendant's rights and finding that the defendant signed the form, the trial court implicitly found that the defendant waived his right to counsel and denied the motion to suppress.

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). However, this court is not bound by the trial court's conclusions of law. State v. Simpson, 968 S.W.2d 776, 779 (Tenn. 1998). The application of the law to the facts found by the trial court are questions of law that this court reviews *de novo*. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. Braziel v. State, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975).

Giving the State the strongest legitimate view of the evidence and allowing for all reasonable inferences to be made leads us to the conclusion that the evidence does not preponderate against the finding of the trial court that the defendant's confession should not be suppressed. There is conflicting testimony as to whether the defendant ever mentioned an attorney during the initial stages of his dealings with Detective Whitehurst. The trial court was in the superior position to evaluate the credibility of both the defendant and Detective Whitehurst, and the evidence does not preponderate against the determination to credit Detective Whitehurst's version of events.

During the motion to suppress hearing, the defendant stated, referring to his discussions with Detective Whitehurst, that, "I told him I didn't want to talk about my case. And just being in jail a couple of days, I hadn't had an attorney to represent me." On cross-examination, the defendant said, "I told him, no, because I didn't have an attorney." We agree with the State that, if anything, the defendant was only stating that he did not have an attorney and was not making an unequivocal request for his attorney. Police are not required to cease questioning a suspect upon an ambiguous mention of an attorney. In <u>Davis v. United States</u>, the Supreme Court, stated, "We decline petitioner's invitation to extend <u>Edwards</u> and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney." 512 U.S. 452, 459 (1994). Furthermore, the <u>Davis</u> court, in rejecting the above proposition, stated,

> The Edwards rule -- questioning must cease if the suspect asks for a lawyer -- provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information. But if we were to require questioning to cease if a suspect makes a statement that might be a request for an attorney, this clarity and ease of application would be lost.

<u>Id</u>. at 461.

Our courts have interpreted this as meaning that after a <u>Miranda</u> warning has been given, an unequivocal request for an attorney needs to be made before a statement will be suppressed. Our supreme court stated ". . . a suspect 'must articulate his desire to have counsel present sufficiently clearly that a reasonable officer would understand the statement to be a request for an attorney.'. . . . If the suspect fails to make such an unambiguous statement, police need not cease questioning (citations omitted)." <u>State v. Huddleston</u>, 924 S.W.2d 666, 670 (Tenn. 1996). A careful review of the record in the instant case does not reveal an unambiguous request by the defendant for an attorney. As such, questioning need not have ceased. Additionally, as the State correctly points out, even if it was determined that the defendant requested an attorney, the defendant waived that right. This court stated, "Once an accused has invoked his right to counsel, he may nevertheless waive this right if (a) he initiates further communications, exchanges, or converses with law enforcement officers and (b) the waiver is knowingly and intelligently made (citations omitted)." <u>State v. Tidwell</u>, 775 S.W.2d 379, 386 (Tenn. Crim. App. 1989). The defendant does not deny signing the clearly explained waiver of his <u>Miranda</u> rights, and a review of the record does not indicate any coercion or lack of knowledge as to his rights on the defendant's behalf. After initially telling Detective Whitehurst he did not want to talk to him, the defendant clearly changed his mind and conversed with the detectives.

The record clearly indicates the defendant waived his rights both to silence and to an attorney. The motion to suppress was properly denied.

### III. Failure to Give a Limiting Instruction

Evidence concerning the defendant's prior convictions for two counts of aggravated robbery and one count of robbery were introduced over the defendant's objection. During jury instructions, the trial court failed to give a limiting instruction that the prior convictions could only be used to

impeach the defendant and not as proof that he committed the crime in question. Whether the prior convictions should have been allowed into evidence is not at issue, only the fact that the trial court failed to give a limiting instruction concerning them. Initially, the State conceded that this failure was reversible error, but no longer concedes that, contending the error did not affirmatively affect the verdict. We agree.

Harmless error analysis in Tennessee is governed by Tennessee Rule of Criminal Procedure 52:

(a) Harmless Error. No judgment of conviction shall be reversed on appeal except for errors which affirmatively appear to have affected the result of the trial on the merits.

Tennessee Rule of Appellate Procedure 36 provides:

(b) Effect of Error. A final judgment from which relief is available or otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.

We will apply this standard.

The defendant argues that the failure to give the limiting instruction allowed the prior convictions to tend to establish the defendant's propensity to commit the crime for which he was on trial. He relies on State v. Howell, 868 S.W.2d 238 (Tenn. 1993), where our supreme court recognized that "there is a significant possibility of misuse with testimony about a defendant's commission of other crimes" as standing for the proposition that limiting instructions are critical in preventing improper and prejudicial use of other crimes. The defendant, however, takes this passage from Howell out of context. The actual quote is: "Accordingly, although there is a significant possibility of misuse with testimony about a defendant's commission of other crimes, and limiting instructions are critical in preventing the improper and prejudicial use of proof of other crimes, see, e.g., State v. Fisher, 670 S.W.2d 232, 237 (Tenn. Crim. App. 1983), we conclude that the trial court did not commit reversible error in failing to give limiting instructions with respect to the proof of other crimes." Howell, at 255.

In Howell, as in the instant case, the defendant failed to request a limiting instruction. Id. at 255. A failure to object to a jury charge does not prevent the failing party from asserting that claim on appeal. Tenn. R. Crim. P. 30(b). However, our supreme court has determined that for such an error to result in prejudice, the error needs to be of a fundamental nature. State v. Reece, 637 S.W.2d 858, 861 (Tenn. 1982). In Reece, the defendant failed to object to the failure of that court to give limiting instructions as to the use of some prior inconsistent statements. Despite that failure, our supreme court concluded that the lack of a limiting instruction was a fundamental error, because the statements themselves were "extremely damaging" and the State's case was weak. Id. at 861. The supreme court in Reece limited its holding, however, to "those exceptional cases in which the impeaching testimony is extremely damaging, the need for a limiting instruction is apparent, and the failure to give it results in substantial prejudice to the rights of the accused." Id.

-14-

Furthermore, the principles from <u>Reece</u> were distinguished again in <u>State v. West</u>, 767 S.W.2d 387, 396 (Tenn. 1989). In <u>West</u>, the defendant asserted the trial court erred in failing to give the jury a limiting instruction that they could only consider the defendant's prior inconsistent statements for purposes of impeachment, and not as substantive evidence. The defendant did not request a limiting instruction and did not raise this issue in his motion for a new trial. He relied upon <u>Reece</u>. Our supreme court distinguished the defendant in <u>West</u> from the one in <u>Reece</u>, stating while comparing the two cases that "[T]he prior inconsistent statements (in <u>Reece</u>) were extremely damaging and the State's case against defendant was weak. Thus the failure to give the limiting instruction was fundamental error even in the absence of a special request. In the instant case (<u>West</u>), the error was neither fundamental nor prejudicial, and was waived." <u>West</u> at 396.

The instant case is also distinguishable from <u>Reece</u>. The State's case against the defendant is strong. In addition to the defendant's confession, he was discovered by the police leaving a convenience store and entering the victim's car. The blue hat found with the defendant was identified by the victim as the one her assailant was wearing. The defendant was in possession of several fifty-dollar bills, which the victim reported being stolen from her. In addition, the impact of the past convictions was weak, relative to the impact of the prior statements made in <u>Reece</u>. In <u>Reece</u>, the court stated, "[I]n the present case, the prior contradictory statements of appellant's daughters struck at the very heart of his alibi defense." <u>Reece</u> at 861. In the present case, the defendant was convicted of kidnapping, car jacking, robbery, and evading arrest. The prior convictions were for aggravated robbery and robbery. While similar, they did not strike at the heart of any defense the defendant offered. The defendant's defense was that someone else did the car jacking. The prior convictions have little, if any, relevance to that defense, although the veracity of the defendant was clearly at issue, as a key determination at trial was whether the jury believed the defendant's story about another man being the assailant and then lending the victim's car to the defendant.

In determining prejudice, we agree with the reasoned approach applied in <u>West</u> and apply the same. There was no fundamental error in the failure to give a limiting instruction. We conclude the trial court did not err.

### IV. Failure to Charge Lesser-included Offenses

The defendant asserts the trial court erred by failing to instruct the jury on the lesser-included offenses for (1) carjacking, namely robbery and theft of property, and (2) Class D felony evading arrest, namely Class E felony evading arrest.

**A. Failure to charge robbery and theft as lesser-included offenses of carjacking:**

A trial court must instruct a jury on a lesser-included offense to the charged offense if the evidence introduced at trial is legally sufficient to support a conviction for the lesser-included

offense.  State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999), see also Tenn. Code Ann.§ 40-18-110.
This duty applies whether or not the defendant requests such instruction.  Burns at 464.

**I.** The first part of our inquiry is to determine whether there are any lesser-included offenses of the charged offense.  An offense is a lesser-included offense if:
   (a) all of its statutory elements are included within the statutory elements of the offense charged; or
   (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
       (1) a different mental state indicating a lesser kind of culpability; and/or
       (2) a less serious harm or risk of harm to the same person, property, or public interest; or
   (c) it consists of
       (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
       (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
       (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Burns, at 466-67.

Carjacking is defined as the intentional or knowing taking of a motor vehicle from the possession of another by use of:  (1)  A deadly weapon; or (2)  Force or intimidation. Tenn. Code Ann. § 39-13-404(a).

Robbery is defined as the intentional or knowing theft of property from the person of another by violence or putting the person in fear. Tenn. Code Ann. § 39-13-401(a).

A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103.

Based on these definitions, both robbery and theft of property are lesser-included offenses under both (a) and (b) of the Burns analysis.

**II.** The second part of our inquiry is to determine whether the evidence introduced at trial was sufficient to mandate an instruction on the lesser-included offenses. State v. Burns, 6 S.W.3d 453, 468 (Tenn. 1999).  In making this determination, the trial court must determine whether evidence exists that reasonable minds could accept as to the lesser-included offense, viewing the evidence liberally in the light most favorable to the existence of the lesser-included offense, and whether the evidence is legally sufficient to support a conviction of the lesser-included offense. Burns at 469.  We conclude the evidence was sufficient to support convictions for the lesser-included offenses.  The State even concedes that the lesser-included offenses should have been charged, but

contends that the failure to charge them was harmless error. This leads us into our third stage of inquiry.

**III.** Our final analysis is whether the error in failing to instruct on the lesser-included offenses was harmless. In order for us to determine there was harmless error, we must conclude the error was harmless beyond a reasonable doubt and did not effect the outcome. State v. Allen, 69 S.W.3d 181, 189 (Tenn. 2001).

Applying this to the present case, finding the defendant guilty of carjacking necessarily means the jury determined beyond a reasonable doubt that a *motor vehicle* was taken. Finding beyond a reasonable doubt that a motor vehicle, the specific type of property that differentiates carjacking from robbery, was taken makes the failure to additionally charge the lesser-included offense of robbery harmless error.

Based on the evidence adduced at trial, we conclude beyond a reasonable doubt that charging robbery or theft would not have affected the outcome of the case. It was uncontroverted that the victim's car was taken. The defendant's defense was that someone else took the car, not that it was not taken. The jury clearly rejected the defendant's version of events. Having clearly rejected the defendant's story that someone else was the assailant in the victim's car, we have no reasonable doubt that a jury faced with charges of carjacking, robbery, or theft of property would have convicted the defendant of carjacking. Accordingly, we must hold the failure to charge as harmless error.

**B. Failure to charge Class E felony evading arrest as a lesser-included offense of Class D felony evading arrest**

Class E felony evading arrest is a lesser-included offense of Class D felony evading arrest, and the State concedes, and we agree, that it was reversible error not to charge it. We cannot say beyond a reasonable doubt that a reasonable jury, given the option of convicting for the Class E felony, would not have done so. Accordingly, we cannot say the failure to charge the jury with the lesser-included offense was not prejudicial to the outcome. Class E felony evading arrest differs from Class D felony evading arrest in that it does not involve the additional element of creating a risk to third parties. See Tenn. Code Ann. § 39-13-603 (b)(3).

While we concluded earlier that the evidence was sufficient to convict the defendant of Class D felony evading arrest, that does not necessarily mean that a reasonable jury would not have, if given the option, convicted of the lesser-included offense. Accordingly, we reverse the defendant's conviction of Class D felony evading arrest and remand that issue to the trial court.

**V. Error to Sentence the Defendant on Count Three (Carjacking) Consecutively**

Following a sentencing hearing, the defendant was sentenced as a multiple offender to (1) eight years for kidnapping, a merger of Count one and two; (2) sixteen years for carjacking, Count three; (3) eight years for robbery, Count four; (4) four years for felony evading arrest, Count five;

and (5) six months for misdemeanor evading arrest, Count six. The carjacking sentence was ordered to be served *consecutive* to the remaining sentences, resulting in a twenty-four-year effective sentence. The sole sentencing issue the defendant raises is that it was error to sentence the defendant consecutively for Count three, carjacking.

This court's review of the sentence imposed by the trial court is *de novo* with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). This presumption is conditioned upon an affirmative showing in the record that the trial judge considered the sentencing principles and all relevant facts and circumstances. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If the trial court fails to comply with the statutory directives, there is no presumption of correctness and our review is *de novo*. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997).

The burden is upon the appealing party to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d) Sentencing Comm'n Comments. In conducting our review, we are required, pursuant to Tenn. Code Ann. § 40-35-210, to consider the following factors in sentencing:
> (1) [t]he evidence, if any, received at the trial and the sentencing hearing; (2) [t]he presentence report; (3) [t]he principles of sentencing and arguments as to sentencing alternatives; (4) [t]he nature and characteristics of the criminal conduct involved; (5) [e]vidence and information offered by the parties on the enhancement and mitigating factors in §§ 40-35-113 and 40-35-114; and (6) [a]ny statement the defendant wishes to make in the defendant's own behalf about sentencing.

A court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:
> (1) [t]he defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
> (2) [t]he defendant is an offender whose record of criminal activity is extensive;
> (3) [t]he defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
> (4) [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
> (5) [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
> (6) [t]he defendant is sentenced for an offense committed while on probation; or
> (7) [t]he defendant is sentenced for criminal contempt.

-18-

Tenn. Code Ann. § 40-35-115(b); see also State v. Black, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). Furthermore, in the event the trial court finds the defendant is a "dangerous offender," it must also determine whether the consecutive sentences (1) are reasonably related to the severity of the offenses committed; (2) serve to protect the public from further criminal conduct by the offender; and (3) are congruent with general principles of sentencing. State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).

The defendant does not contest the length of the sentences, only that his sentence for carjacking, Count three, was ordered to run consecutively to the other sentences. In ordering the consecutive sentence, the trial court found the following factors under Tennessee Code Annotated section 40-35-115(b):
> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
> (2) The defendant is an offender whose record of criminal activity is extensive;
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high.

In making the above findings, the trial court said, "And the Court feels that number one applies, that the defendant is a professional criminal, he has had all those arrests, he had been incarcerated, he has failed to comply with the rules of release in the community, but all those indicate that number one should apply." Without stating any additional reasons, the court also stated that it was of the opinion that Number two applies, and that Number four applies, as the behavior in this case rates the defendant as a dangerous offender. We can attribute the findings made concerning the defendant's multiple arrests and incarceration to factor (2), that his record of criminal activity was extensive, but we cannot make the same attribution to factor (4). If a defendant is sentenced consecutively based on being a dangerous offender, there are two additional requirements that must be met. In State v. Wilkerson, our supreme court stated "The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." 905 S.W.2d 933, 938 (Tenn. 1995). The trial court failed to make the additional findings required by Wilkerson. Accordingly, we must determine if consecutive sentencing was merited based solely on the first two factors.

The defendant has an extensive record of criminal convictions, including two convictions for aggravated robbery, two convictions for assault, motor vehicle theft, theft, robbery, possession of cocaine, possession of drug paraphernalia, public intoxication, and driving on a suspended or revoked license. Additionally, the defendant had numerous arrests that never resulted in a conviction. We agree with the defendant that, despite this impressive list of prior convictions, there is not enough evidence to preponderate that the defendant derived his livelihood from his criminal activities and, therefore, conclude that factor (1) was misapplied. However, we conclude overwhelmingly that the defendant's record of criminal activity was extensive, and we reject the defendant's argument to the contrary.

This court recently made a similar determination that while a defendant's criminal activity did not make him a professional criminal, it nonetheless satisfied factor (2) of being extensive and, therefore, supporting consecutive sentences. In State v. Jackie F. Curry, No. E2000-02475-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 586, at *18 (Tenn. Crim. App. August 2, 2001, at Knoxville) perm. to appeal denied (Nov. 5, 2001, LEXIS 788), the trial court sentenced the defendant consecutively, basing that decision on part on the presentence report which indicated that the defendant had been convicted of the following crimes: sale of cocaine, vandalism not more than $500, traffic offenses, driving with a revoked license, and other offenses which could not be defined. In affirming the consecutive sentences based on the defendant's extensive criminal history and not the defendant being a professional criminal, this court stated, "[D]efendant was not a professional criminal under T.C.A. § 40-35-115(b)(1), but did have an extensive record of criminal activity under T.C.A. § 40-35-115(b)(2), and had been convicted for offenses committed while on probation, under T.C.A. § 40-35-115(b)(6), supporting the imposition of consecutive sentences." Id. We find no comparison. The criminal record of the defendant in the instant case far surpasses that of the defendant in Curry.

Accordingly, finding that the trial court properly utilized the extensive criminal history factor from Tennessee Code Annotated section 40-35-115(b), we affirm the trial court's imposition of the sentence for carjacking to be served consecutive to the other sentences.[6]

_____
JOHN EVERETT WILLIAMS, JUDGE

---

[6] The Class D felony evading arrest conviction was reversed.